UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JERRY JANVRIN, d/b/a J&J TRUCKING,<br><br>            Plaintiff,<br><br>    vs.<br><br>CONTINENTAL RESOURCES, INC., an Oklahoma corporation,<br><br>            Defendant. | 4:14-CV-04124-KES<br><br>ORDER DENYING MOTION FOR SUMMARY JUDGMENT |

Defendant, Continental Resources, Inc., moves for summary judgment. Plaintiff, Jerry Janvrin, d/b/a J&J Trucking, resists the motion. For the following reasons, the court denies the motion.

## BACKGROUND

The facts, viewed in the light most favorable to Janvrin, the non-moving party, are as follows:

Janvrin is a resident of Harding County, South Dakota. He owns J&J Trucking, a business that provides hauling services in South Dakota, North Dakota, and Montana. Continental is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. It is an oil and gas exploration company that, among other locations, is registered to do business in South Dakota. Continental has oil wells located near Buffalo, South Dakota, which is located in Harding County.

Non-party CTAP, Inc., is a supplier of pipeline, casings, tubing, and other goods used by oil and gas companies. It is based in Lafayette, Colorado, and

maintains supply yards in Utah, Colorado, Montana, Ohio, and North Dakota. Continental is a major customer of CTAP. CTAP employs its own haulers to deliver oilfield material to its customers' oil well locations. CTAP also hires independent contractors to haul oilfield materials when CTAP does not have enough of its own employees to make the deliveries.

CTAP maintains a list of the independent contractors who are qualified by CTAP to deliver loads to its customers. Janvrin began hauling oilfield materials as an independent contractor with CTAP in 2010, and he obtained approval to haul oilfield materials from any of CTAP's supply yards. Janvrin primarily hauled pipeline from CTAP's supply yards in Bowman, North Dakota, and Glendive, Montana. Some of the shipments hauled by Janvrin were destined for delivery to Continental.

Janvrin did not initially have a written agreement with CTAP for the provision of his services. At some point, however, Janvrin and CTAP began executing contracts on a yearly basis. CTAP and Janvrin executed their most recent contract on December 21, 2012.

On February 20, 2014, an article appeared in a Harding County newspaper. *See* Docket 16-7.[1] The article was titled, "Pickup and Cows Collide with Dire Results." The pickup was owned by Continental and driven by a Continental

---

[1] Newspaper articles are generally considered hearsay and thus inadmissible for summary judgment purposes. *Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010). Janvrin's theory is that Continental retaliated against him after reading the article, regardless of whether the article is true. Thus, the court finds that the article is offered for the non-hearsay purpose of demonstrating its effect upon the recipient. *See Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999) ("A common type of statement that falls outside the hearsay definition, because it is not offered for its truth, is a statement that is offered to show its effect on the recipient.").

2

employee named Jess Wammen. The pickup collided with two cows on a county road north of Buffalo. The cows belonged to David Niemi. Janvrin's sister, Roxie, is married to Niemi. Janvrin operates J&J Trucking out of his home, which is located on the Clarkson Ranch. The Clarkson Ranch is situated along the same county road as the Niemi property. A comment attributed to Janvrin appeared in the newspaper article. Janvrin expressed his belief that many drivers on the county road drive too fast for the road's conditions. Janvrin did not, however, refer specifically to Continental.

     Gordon Carlson is an area supervisor for Continental. His office is located in Harding County. He read the newspaper article and discussed it with Peter MacIntyre. MacIntyre is an engineer with Continental for its Buffalo district. Carlson felt that Janvrin's comments were inappropriate. He equated Janvrin's actions to "biting the hand the feeds you." Docket 16-2 at 5. Carlson informed MacIntyre that he did not want Janvrin's trucking company doing business in the Buffalo district.

     MacIntyre eventually spoke with Ollis Anderson. Anderson is the director of Continental's supply chain management. His duties include obtaining supplies and materials necessary for some of Continental's oil and gas operations. The newspaper article was brought to his attention by MacIntyre. MacIntyre and Anderson discussed how Continental was having problems with the Niemis, the Clarksons, and the Janvrins. MacIntyre informed Anderson that he would prefer if Janvrin did not make deliveries to Continental's well locations in South Dakota.

     Anderson called Michael "Stoney" McCarrell about a week later to facilitate MacIntyre's request. McCarrell is a senior vice president of CTAP's operations,

quality control, and technical sales. He oversees aspects of CTAP's business at CTAP's supply yards. Although McCarrell did not decide which independent contractors would be added to CTAP's approved list, he testified that he had the authority to order the removal of an independent contractor from the list.

Anderson asked McCarrell to no longer allow Janvrin to deliver to Continental. McCarrell responded affirmatively. McCarrell then called Ron Spidahl, the CTAP yard manager in Bowman, North Dakota. McCarrell told Spidahl to remove Janvrin from CTAP's list of approved independent contractors for CTAP's Bowman yard. Spidahl recalled that "Continental is the number one customer [for CTAP]" with "the biggest account" in the Bakken Formation and that CTAP "did everything for Continental." Docket 16-6 at 4. Spidahl complied with McCarrell's request, and informed Janvrin that he could no longer haul materials for CTAP.

Janvrin testified that he had received periodic business from CTAP prior to being notified that he would no longer be hauling materials for the company. He explained that the frequency of CTAP's requests depended on a number of factors: the amount of drilling activity at the time, the availability of CTAP drivers, and competition from other independent contractors. Janvrin testified that, nonetheless, CTAP brought in a fairly consistent level of business over the last few years.

Janvrin filed suit in state court alleging one claim for tortious interference with a business relationship. *See* Docket 1-3 (complaint). Continental removed the action to this court on August 11, 2014. Docket 1. Jurisdiction is premised on diversity of citizenship.

**LEGAL STANDARD**

Summary judgment on all or part of a claim is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Craig*, 144 F.3d 593, 595 (8th Cir. 1998). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party has met this burden, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "Further, 'the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, the dispute must be outcome determinative under prevailing law.' " *Id.* (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992)). The facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion" for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

In addition to the Federal Rules of Civil Procedure, this court has adopted local rules in civil cases that are binding on the parties. *Braxton v. Bi-State Dev. Agency*, 728 F.2d 1105, 1107 (8th Cir. 1984) ("Rules of practice adopted by United States District Courts have the force and effect of law."). Local Rule 56.1 is the

local rule governing motions for summary judgment. *See* D.S.D. Civ. LR 56.1. The purpose of local rules like Local Rule 56.1 "is to distill to a manageable volume the matters that must be reviewed by a court undertaking to decide whether a genuine issue of fact exists for trial. [They are] designed 'to prevent a district court from engaging in the proverbial search for a needle in the haystack.' " *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (discussing W.D. Mo. LR 56.1(a)) (quoting *Nw. Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 725 (8th Cir. 2003)). And "the application of local rules is a matter peculiarly within the district court's province." *Yannacopoulos v. Gen. Dynamics Corp.*, 75 F.3d 1298, 1305 (8th Cir.1996) (internal quotations and citation omitted). Thus, the court is vested with a large measure of discretion in applying its local rules. *Silberstein v. IRS*, 16 F.3d 858, 860 (8th Cir. 1994).

## DISCUSSION

### I.     Compliance with the Local Rules

Continental included in its summary judgment brief a statement of the facts that it contends are material and undisputed. Janvrin filed a document responding to Continental's statement of facts. *See* Docket 17. He agreed that some of Continental's facts were undisputed but he objected to others. And Janvrin filed a separate document consisting of the facts that he contends are material and undisputed or, at least, that call some of Continental's facts into dispute. *See* Docket 18. Continental responded to Janvrin's separate statement of facts. *See* Docket 22. Continental agreed that some of Janvrin's facts were undisputed, but it objected to others and asserted that Janvrin's separate submission was improper under the court's local rules.

When a party moves for summary judgment, the moving party is required to support its motion with "a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." D.S.D. Civ. LR 56.1(A). A party's statement of material facts (SMF) must be separated into paragraphs by number and must contain "an appropriate citation to the record in the case." *Id.* The party opposing the summary judgment motion must respond to each assertion in the moving party's SMF "with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1(B). The opposing party must also "identify any material facts on which there exists a genuine material issue to be tried." *Id.*

The court concludes that Janvrin's separate statement complies with the court's local rules. A responding party is not limited to refuting only the facts that the moving party relies on. Rather, the responding party should also identify other facts in the record that call the moving party's version of the facts into dispute. Although some of the facts in Janvrin's separate statement are immaterial or duplicative of facts that he acknowledged previously as undisputed, the court finds that Janvrin has substantially complied with Local Rule 56.1.

## II. Tortious Interference

Janvrin alleges that he had a valid business relationship or expectancy with CTAP and that Continental tortuously interfered with that relationship. More specifically, Janvrin argues that Continental retaliated against him for comments attributed to him in the newspaper article and that Continental caused CTAP to stop doing business with him. Continental contends that summary judgment

7

should be granted in its favor because Janvrin cannot establish the essential elements of his tortious interference claim.

In South Dakota, the elements of a tortious interference with business relationships or expectancy claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and improper act of interference on the part of the interferer;[2] (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted. *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992). The South Dakota Supreme Court has analogized this cause of action to "a 'triangle' [involving] a plaintiff, an identifiable third party who wished to deal with the plaintiff, and the defendant who interfered with the plaintiff and the third party." *Landstrom v. Shaver*, 561 N.W.2d 1, 16 (S.D. 1997). This is a "factually driven cause of action" and is "dependent on the plaintiff's factual situation." *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 250 n.6 (S.D. 1999).

### A.    **Intentional and improper act of interference**

Continental does not dispute that Janvrin had a valid business relationship or expectancy with CTAP or that Continental knew about that relationship. Rather, Continental's summary judgment motion focuses on the third element: whether it intentionally and improperly interfered with Janvrin's relationship with CTAP.

---

[2] The South Dakota Supreme Court previously described the third element as involving "unjustified" interference, which was recently modified to require a showing of "improper" interference. *See Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008).

### i.     Interference

Continental first argues that it did not "interfere" with Janvrin's relationship with CTAP as that word is defined under South Dakota law. According to Continental, interference occurs only where a contracting party fails to perform or is completely prevented from performing its contractual duties. Continental argues that it did not commit interference because CTAP neither failed to perform nor was prevented from performing any duty under its contract with Janvrin.

Under the terms of the Janvrin-CTAP contract, CTAP did not guarantee that any specific number of loads would be assigned to Janvrin. Docket 13-3 at 5. CTAP also reserved the right to use the services of any independent contractor it chose. *Id.* And the agreement could be terminated upon thirty days' written notice by other party. *Id.* at 4.[3] Continental argues that the Janvrin-CTAP relationship was terminable at will and that Continental could, therefore, act with impunity toward that relationship as long as it did not cause CTAP to breach the contract.

The South Dakota Supreme Court generally patterns its definition of tortious interference after the Restatement (Second) of Torts. *See, e.g., Tibke*, 479 N.W.2d at 908; *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008). According to the Restatement, a contract is merely one type of business relationship protected by the law. *See* Restatement (Second) of Torts § 766 cmt. c ("The liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations"). Thus, the South Dakota Supreme Court has

---

[3] It is unclear whether the contract was ever formally terminated. McCarrell, for example, testified that he was unsure if the agreement was ever terminated. Docket 13-2 at 15.

explained that, " '[f]or this tort to occur, the business relationship, if in existence, need not be cemented by written or verbal contract and, whether or not it is in existence, it need not be intended that there be a contract.' " *Hayes*, 590 N.W.2d at 248 (quoting 45 Am. Jur. 2d *Interference* § 50 (1969)). Contracts terminable at will also provide some protection from improper, outside interference. Restatement (Second) of Torts § 766 cmt. g ("A similar situation exists with a contract that, by its terms or otherwise, permits the third person to terminate the agreement at will. Until he has so terminated it, the contract is valid and subsisting, and the defendant may not improperly interfere with it"). In other words, one party cannot escape liability for intermeddling with a business relationship that otherwise would have continued absent that party's intervention. As the South Dakota Supreme Court has held, "[t]he tort also protects a party's interest in stable economic relationships." *Hayes*, 590 N.W.2d at 248 (citation omitted). "The 'expectancies' this tort protects . . . is the prospect or opportunity of repeat and additional [business]." *Id.* at 250. And the Court in *Gruhlke* acknowledged, albeit cautiously, that a plaintiff could state a claim for tortious interference even though her "contract was essentially a one year employment-at-will agreement." *Gruhlke*, 756 N.W.2d 405-06.

      Additionally, Janvrin did not allege that Continental caused CTAP to breach its contract with him. One species of a tortious interference claim alleges that a defendant interfered with an existing contractual relationship. *See* Restatement (Second) of Torts § 766. Another type of tortious interference claim alleges that a defendant interfered more generally with a plaintiff's business relations or expectations. *See* Restatement (Second) of Torts § 766B. As the South Dakota

10

Supreme Court has acknowledged, "[t]his tort has a variety of titles." *Hayes*, 590 N.W.2d at 248 n.4. Here, Janvrin alleges that Continental committed the second variety of this tort. *See* Docket 1-3 at 4 (alleging Continental interfered with Janvrin's "valid business relationship that Janvrin maintained with CTAP"). Interference of this variety includes "inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another." *Setliff v. Akins*, 616 N.W.2d 878, 889 (S.D. 2000). More broadly stated, a plaintiff needs "to show that [his] relationship with an identifiable third party was *affected by* [the defendant's] actions." *Table Steaks v. First Premier Bank, N.A.*, 650 N.W.2d 829, 835 (S.D. 2002) (emphasis added). The question, therefore, is whether Continental induced CTAP not to continue its business relationship with Janvrin.

     South Dakota caselaw illuminates the contours of this element. In *Tibke*, 479 N.W.2d at 900, the plaintiff accused several defendants of tortuously interfering with her business relationships or expectancies. Tibke was a horse trainer by trade and the defendants were members of an equestrian society who revoked Tibke's membership rights and privileges in that society. *Id.* at 900-01. Tibke later sought to deal with John and Elaine Thomas. *Id.* at 909. She offered to train and prepare one of the Thomases' horses for a horse show in Wyoming. *Id.* One of the defendants, however, made a phone call to the Thomases and told them that the equestrian society would forbid Tibke from showing their horse at the event. *Id.* Summary judgment was denied as to whether the defendant interfered with Tibke's business relationship. *Id.*

11

In *Setliff*, 616 N.W.2d at 883, Setliff and Akins were working together at a clinic in Sioux Falls, South Dakota. Their relationship began to sour and Akins contemplated starting his own practice. *Id.* Stewart, a consultant for the clinic, helped facilitate Akins' desire to leave. *Id.* at 884. Setliff sued Stewart for tortious interference. *Id.* at 889. Stewart persuaded Akins to leave the clinic, encouraged Akins to start his own practice, leased office space to Akins, became a principal stockholder in Akins' company, and secured his own consulting agreement with Akins' company. *Id.* at 890. Stewart's conduct was also sufficient to survive a motion for summary judgment. *Id.*

Here, and viewing the facts in the light most favorable to Janvrin, the record shows that Continental induced CTAP to not continue doing business with Janvrin. Janvrin testified that his relationship with CTAP was fairly stable. Spidahl confirmed that he previously had not received any complaints about Janvrin. Docket 16-6 at 3. Thus, the Janvrin-CTAP relationship likely would have continued. Like in *Tibke*, Continental's act of interference involved a chain of phone calls originating from Continental to CTAP. Continental was one of CTAP's major customers and CTAP would not ignore Continental. Similarly to *Setliff*, CTAP was persuaded or encouraged not to do business with Janvrin. And those phone calls ultimately resulted in Janvrin's removal from CTAP's list of approved independent haulers. Thus, there is evidence that Continental interfered with Janvrin's relationship with CTAP.

### ii.     Intent

Continental argues that even if it did interfere with the Janvrin-CTAP relationship, it did not do so intentionally. Specifically, Continental contends that it did not intend for CTAP to stop using Janvrin's trucking service.

In general, "[i]ntent in the law of torts means that the actor acts for the purpose of causing an invasion of another's interest (invasion of privacy, for example) or knows that such an invasion is resulting, or is substantially certain to result from his conduct." *Kjerstad v. Ravellette Pubs., Inc.*, 517 N.W.2d 419, 429 (S.D. 1994) (citing 74 Am. Jur. 2d Torts § 6). Thus, the question is not whether Continental acted with the specific design of causing CTAP to stop using Janvrin's trucking service. *Cf. Frey v. Kouf*, 484 N.W.2d 864, 868 (S.D. 1992) ("The jury was instructed that, to find Kouf liable, it must find Kouf had a specific design to cause the injury to Frey. That was an incorrect statement of the law"). Rather, the question is whether Continental knew that interference of the Janvrin-CTAP relationship was certain or substantially certain to occur as a result of its actions. *Kjerstad*, 517 N.W.2d at 429; *see also* Restatement (Second) of Torts § 766B ("The interference with the other's [business] relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action").

Additionally, questions surrounding a party's intent or state of mind are typically questions of fact for the jury and, therefore, not suited for summary adjudication. *Ahl v. Arnio*, 388 N.W.2d 532, 534 (S.D. 1986). Likewise, a person's description of his state of mind implicates his credibility, which is also an issue for the jury to consider. *See Gleason v. Peters*, 568 N.W.2d 482, 489 (S.D. 1997) ("It is

13

the jury, not the court, which . . . judges the credibility of witnesses[.]") (quoting *Fajardo v. Cammack*, 322 N.W.2d 873, 878 (S.D. 1982) (Wollman, C.J., concurring specially)); *Strassburg v. Citizens State Bank*, 581 N.W.2d 510, 517 (S.D. 1998).

The issue of intent as a jury question is demonstrated by *Tibke*. There, all of the defendants gave sworn statements that "they have never said or done anything intend[ing] to interfere with any business relations of [Tibke], nor have they ever discouraged or tried to dissuade anyone from using Tibke as a horse trainer." *Tibke*, 479 N.W.2d at 902. Summary judgment was denied, nonetheless, with respect to one of the defendants because of "a phone call he made may have affected an alleged agreement between" Tibke and the Thomases. *Id.* at 903.

Here, the evidence shows that Carlson told MacIntyre that he did not want Janvrin's trucking company doing business in the Buffalo area. MacIntyre relayed to Anderson that Continental did not want Janvrin to make deliveries to Continental's well locations in South Dakota. Ultimately, Janvrin was removed from CTAP's list of haulers. Thus, there is evidence that a phone call made by Continental may have affected an alleged agreement between CTAP and Janvrin and the intent of Continental in making the phone call is a question of fact for the jury to determine.

### iii. Impropriety

Continental also argues that it did not act improperly. The South Dakota Supreme Court in *St. Onge Livestock Co., Ltd. v. Curtis*, 650 N.W.2d 537, 542 (S.D. 2002), outlined the factors courts should consider to determine if an actor's conduct is improper. The factors are patterned on the Restatement (Second) of Torts § 767, and consist of the following:

14

>   (a) the nature of the actor's conduct;
>   (b) the actor's motive;
>   (c) the interests of the other with which the actor's conduct interferes;
>   (d) the interests sought to be advanced by the actor;
>   (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
>   (f) the proximity or remoteness of the actor's conduct to the interference; and
>   (g) the relations between the parties.

*Id.* (quoting Restatement (Second) of Torts § 767)). The Court also cautioned that "these instructions are neither exhaustive nor determinative." *Id.* n.2.

Like determining a party's intent, determining whether a party's conduct was improper is generally a question of fact that is not readily subject to summary adjudication. *See Gruhlke*, 756 N.W.2d at 408 ("What constitutes improper interference will depend on the particular facts of each case with consideration of the elements above"). The Court in *St. Onge* considered the factors outlined in the Restatement and analyzed whether the defendant's conduct was improper. *St. Onge*, 650 N.W.2d at 542. It then cited with approval several cases dealing with the impropriety criteria. *See id.* A case from the Tenth Circuit was cited for the proposition that "balancing of [the] factors to determine whether conduct was justified is [a] task for [the] fact finder." *Id.* (citing *Q.E.R. v. Hickerson*, 880 F.2d 1178, 1183-84 (10th Cir. 1989). Another case was quoted for its rationale that " 'whether or not interference with [business] relations is justified is basically a question of fact.' " *Id.* (quoting *Hennum v. City of Medina*, 402 N.W.2d 327, 336 (N.D. 1987)). And as the Restatement explains, "[t]he decision [whether conduct is improper] depends upon a judgment and choice of values in each situation." Restatement (Second) of Torts § 767 cmt. b.

Here, Continental argues that it acted in accordance with its own legitimate interests and that it had the right to forbid anyone at all onto its well locations. It cites the Restatement for the proposition that "[d]eliberately and at one's pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper." Docket 13 at 14 (quoting Restatement (Second) of Torts § 766 cmt. b). The same section cautions, however, that "there is a general duty not to interfere intentionally with another's reasonable business expectancies of trade with third persons, whether or not they are secured by contract, unless the interference is not improper under the circumstances." Restatement (Second) of Torts § 766 cmt. b.

Continental also relies on a case from the Fifth Circuit, *DBI Servs., Inc. v. Amerada Hess Corp.*, 907 F.2d 506 (5th Cir. 1990). The plaintiff in that case, like Janvrin, was a trucking company. The defendant, like Continental, was an oil producer. The defendant "decided to cease dealings with [the plaintiff] as of December 17, 1986." *Id.* at 507. And "it had made it amply clear that it did not wish to be served by [the plaintiff]." *Id.* at 509. The plaintiff, nonetheless, attempted on three separate occasions to bypass the defendant's mandate by subcontracting with third-parties. *See id.* at 507-08. Those third-parties contracted with the defendant for trucking services and then subcontracted the work to the plaintiff. The defendant, however, forbade the plaintiff from making deliveries. The Fifth Circuit held that the defendant's "refusal to allow [the plaintiff] to provide it with services and water indirectly through third parties was a legitimate exercise of its common law right to choose with whom to deal, rather than an improper interference with [the plaintiff's] contracts." *Id.* at 509.

16

The *DBI Services* case is distinguishable. In *DBI Services*, the plaintiff alleged that the defendant tortuously interfered with several contracts the plaintiff entered into *after* the defendant gave the plaintiff notice that it no longer wanted to be served by the plaintiff. Here, Janvrin alleged that Continental interfered with an existing business relationship. Additionally, the plaintiff in *DBI Services* did not argue that the defendant's initial decision or notice was improper. Rather, the case turned on the application of a specific privilege under Texas law applicable to tortious interference claims: "a party is privileged to interfere with another's contract if (1) it is done in a bona fide exercise of his own rights, or (2) he has an equal or superior right in the subject matter to that of the other party." *Id.* at 508 (quoting *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). Continental has not identified an analogous privilege in South Dakota law. Instead, the South Dakota Supreme Court has held that "self interest is not a defense where a party's conduct is improper." *Table Steaks*, 650 N.W.2d at 837 (finding that the jury "reasonably concluded that [the defendant] exceeded its rightful authority"); *see also* Restatement (Second) of Torts § 767 cmt. b. (explaining that the inquiry "is expressed in terms of whether the interference is improper or not, rather than in terms of whether there was a specific privilege to act in the manner specified"). And whether Continental's actions were improper or not depends on the factors identified above.

Continental primarily focuses on the motivation factor. It contends that there were a number of permissible reasons underpinning its actions. For example, Carlson felt that Janvrin's comments in the newspaper article were improper and akin to "biting the hand that feeds you." Docket 16-2 at 5. Carlson

17

also recalled negative comments Janvrin allegedly made toward the oil field that were not reproduced in the newspaper article. MacIntyre testified that Janvrin had arrived at Continental's locations in the past without wearing a hardhat, safety glasses, boots, or other required equipment. Docket 16-4 at 3. MacIntyre also explained that Janvrin was twice told that he could not come on Continental's well locations without donning proper safety gear. MacIntyre also noted the lawsuit instigated against Continental by Niemi–a relative of Janvrin–as another reason why Continental did not want Janvrin's trucking company making deliveries to it. And there is no evidence that Continental was rude or that it directly threatened CTAP. These reasons, if believed by a jury, suggest that Continental did not act improperly.

      The court must view the facts in the light most favorable to Janvrin, however, and make all reasonable inferences in his favor. Through that lens, a jury may also decide that Continental acted improperly. For example, Janvrin's comments as reported in the newspaper article were not directed at Continental or any of its employees. Rather, Janvrin expressed a general frustration with the drivers on the county road going too fast for the road's conditions. Continental may have taken offense to those comments, but a jury may wonder whether Continental's decision to retaliate against Janvrin was appropriate. Likewise, although Carlson testified that he heard of additional comments made by Janvrin that were not reported in the article, he could not recall who told him about those comments or anything more specific other than that Janvrin was "very upset" with oil field traffic. Docket 16-2 at 3. A jury may also question MacIntyre's recollection of Janvrin's safety policy compliance if there are no records kept of Janvrin's two

18

prior reprimands (and here there are none). Related to this point, Spidahl testified that he previously had not received any complaints about Janvrin. And the lawsuit between Niemi and Continental did not involve Janvrin except for the fact that Janvrin was the brother of Mrs. Niemi. But the fact that two people from a small town in rural South Dakota are related may not surprise members of a South Dakota jury.

Whether Continental's actions were improper depends on an assessment of choices and values applied to the specific circumstances of the case. That type of assessment is a province of the jury and not the court. The jury will also likely need to see and judge the veracity of live testimony to reach its decision.

## CONCLUSION

The court concludes that whether Continental improperly and intentionally interfered with Janvrin's relationship with CTAP presents questions of fact for the jury. Accordingly, it is

ORDERED that Continental's motion for summary judgment (Docket 12) is denied.

Dated June 27, 2016.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE