UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JERRY JANVRIN<br>d/b/a J&J TRUCKING,<br><br>            Plaintiff,<br><br>    vs.<br><br>CONTINENTAL RESOURCES, INC., an<br>Oklahoma Corporation,<br><br>            Defendant. | 4:14-CV-4124-KES<br><br><br>ORDER DENYING DEFENDANT'S<br>RENEWED MOTION FOR JUDGMENT<br>AS A MATTER OF LAW AND MOTION<br>FOR A NEW TRIAL |

Plaintiff, Jerry Janvrin, sued defendant, Continental Resources, for tortious interference with a business relationship alleging that Continental intentionally interfered with Janvrin's business relationship with CTAP, Inc. After the close of Janvrin's case in chief and again at the close of all the evidence, but before the jury returned a verdict, Continental moved for a judgment as a matter of law on Janvrin's claim. The court heard oral arguments and reviewed Continental's written brief and denied Continental's motion. Docket 85. Continental filed a Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial.

## BACKGROUND

Janvrin owned J&J Trucking, a business that provided hauling services in South Dakota, North Dakota, and Montana. Continental Resources is an oil and gas exploration company that owns well locations in South Dakota, North Dakota, Montana, and other states. Continental's well locations in Harding County, South Dakota are referred to as the "Buffalo District" and make up a

1

small number of its overall well locations. Non-party CTAP, Inc., is a supplier of pipeline, casings, tubing, and other goods used by oil and gas companies. From 2010 to February of 2014, J&J Trucking was on a list of independent contractors qualified by CTAP to deliver loads to its customers. J&J Trucking only delivered to wells out of CTAP's Bowman, North Dakota yard. The Bowman yard delivered supplies to well locations in the Buffalo District and several other locations in North Dakota. On February 19, 2014, CTAP informed Janvrin that J&J Trucking was no longer on CTAP's list of qualified independent contractors and would no longer deliver loads to CTAP customers.

At trial, Janvrin presented evidence that on Wednesday, February 19, 2014,[1] an article appeared in the Harding County newspaper describing an accident between a Continental employee who was driving a Continental vehicle and two cows on a county road north of Buffalo, South Dakota. The cows belonged to Roxy and David Niemi—Janvrin's sister and brother-in-law. Janvrin was paraphrased in the article expressing his belief that many drivers on the county road drive too fast for the road's conditions. Janvrin's theory of the case was that Continental induced or otherwise pressured CTAP to end its business relationship with J&J Trucking in retaliation for Janvrin's comment in the newspaper article. Continental claimed that it only asked CTAP not to have Janvrin deliver loads to its well locations in the Buffalo District, but that Janvrin was welcome to deliver to Continental's other well locations.

---

[1] The date on the newspaper article is February 20, 2014, but testimony at trial established that the newspaper was actually delivered on February 19, 2014.

Continental further claimed that it did not want Janvrin delivering to its locations in the Buffalo District because Janvrin was a safety risk.

Janvrin presented testimony from several witnesses to show the timeline of events that led to his termination. After reading the article in the Harding County newspaper, Gordan Carlson, Continental's Buffalo District supervisor, testified that he believed that Janvrin's comments were disrespectful and he called Continental's Buffalo District unit engineer, Peter MacIntyre, and requested that MacIntyre prohibit Janvrin from providing trucking services to Continental. MacIntyre agreed to contact Ollis Anderson because Anderson was responsible for arranging how materials were delivered to well locations. After MacIntyre discussed the newspaper article with Anderson, Anderson called Stoney McCarrell, Vice President of Operations for CTAP. Anderson testified that he told McCarrell that he did not want Janvrin making deliveries to the Buffalo District, but that J&J was free to deliver to the rest of Continental's wells. McCarrell testified that Anderson told him that Continental did not want Janvrin to make deliveries to any of its well locations. Finally, Ron Spidahl testified that McCarrell called Spidahl and told him to take J&J Trucking out of the line up at the Bowman yard because McCarrell got a call from the "big guy." The effect of J&J being taken out of the line-up was that J&J would no longer deliver any loads for CTAP out of the Bowman yard.

There was conflicting testimony as to how much time passed between each communication. Carlson, MacIntyre, and Anderson all testified that several days or a week passed between the day the newspaper was published

and the day Anderson called McCarrell. But Spidahl testified that J&J Trucking was removed from the list of haulers at the Bowman yard on February 20, 2014, and Janvrin testified that he received the phone call from Spidahl on the evening of February 19, 2014.

To support his theory that Continental retaliated against Janvrin for his comments in the newspaper, Janvrin presented testimony from Spidahl that he later received a phone call from Duke Ochellar of CTAP that "there would be hell to pay" if Ochellar found out that Spidahl said something to Continental. Also, David Tilus, a Continental employee, testified that he overheard Carlson talking to another gentleman about J&J Trucking not delivering for CTAP anymore and later called Justin Till, a former Continental and J&J Trucking employee, to talk to him about it. While Tilus testified that he never said Carlson boasted about putting J&J Trucking out of business, Till testified that Tilus told him that Carlson boasted that he put J&J Trucking out of business.

Continental renews its motion for judgment as a matter of law and moves for a new trial. Continental contends that the court improperly instructed the jury on the law and applied the incorrect standard to determine whether to submit punitive damages to the jury. Continental also argues that a reasonable jury could not find that the interference was intentional or improper, that Continental's conduct was the legal cause of Janvrin's injury, or that Janvrin's damages calculations were supported by competent evidence. Finally, Continental claims that the evidence conclusively established that Janvrin

failed to mitigate his damages and that there is legally insufficient evidence to support an award of punitive damages.

**LEGAL STANDARD**

Judgment as a matter of law can be granted when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50(a)(1). "The court views the evidence in the light most favorable to the nonmoving party." *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996). "Judgment as a matter of law is appropriate '[w]hen the record contains no proof beyond speculation to support [a] verdict.' " *Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 482 (8th Cir. 2002).

After a jury trial, the court may grant a new trial to any party on all or some of the issues. Fed. R. Civ. P. 59(a). The court should grant a new trial where "the verdict is against the 'great weight' of the evidence, so that granting a new trial would prevent a miscarriage of justice." *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1266 (8th Cir. 1994).

I. **The court's Jury Instruction No. 6 was a correct statement of the law.**

Continental contends that this court improperly instructed the jury as to South Dakota law. In *Tibke v. McDougall*, 479 N.W.2d 898, 908 (S.D. 1992), the South Dakota Supreme Court clarified the elements of a tortious interference with a business relationship. The Court stated that the elements are as follows: "(1) the existence of a valid business relationship or expectancy; (2) knowledge

5

by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted." *Id.* The South Dakota Supreme Court further explained that the previously stated elements more closely follow Restatement (Second) of Torts §§ 766 and 766B. *Id.*

Continental argues that part of Jury Instruction No. 6 was an inaccurate statement of the law. The relevant part of the instruction states, "(1) Continental Resources has the right to refuse to do business with Jerry Janvrin and to exclude Jerry Janvrin from its property; (2) But Continental Resources cannot improperly interfere with Jerry Janvrin's business interest with CTAP." Docket 77 at 8. Continental contends that the second part of the instruction was improper because it suggested that its absolute right to exclude Janvrin from its property and refuse to do business with Janvrin was a conditional right.

Continental heavily relies on *Johnson v. Schmitt*, 309 N.W.2d 838, 839 (S.D. 1981), to support its argument that it had the absolute right to refuse to do business with Janvrin. The proposed jury instruction in *Johnson* that Continental relies on stated:

> You are instructed that (appellants) have an absolute right to sell or not to sell water to any person. You are further instructed that there is no liability for procuring a breach of contract where such breach is caused by the exercise of an absolute right, that is, by an act which a person has a definite legal right to do.

*Id.* at 840. The trial court in *Johnson* did not give the above instruction because, while it found the legal theory was valid, it did not apply to the facts of the case, and the South Dakota Supreme Court agreed. *Id.* The legal theory relied on to formulate the above instruction is stated in Restatement (Second) of Torts § 773. Section 773 applies where a defendant admits that he intentionally and knowingly interfered with a contract or relationship but alleges that he did so in good faith and to protect a legal right.[2]

Here, the legal theory stated in § 773 and the proposed *Johnson* instruction do not apply to these facts because Continental does not admit that it intentionally interfered with the CTAP—J&J Trucking business relationship. Instead, Continental adamantly denies that it intended to interfere with the relationship. Thus, the defense contemplated in § 773 of the Restatement did not apply to the facts of the case and was not relevant at trial. Instead this court referenced sections 776 and 766B for Jury Instruction No. 6.

---

[2] Section 773 is applicable where "(1)[the actor] has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means. Under these circumstances his interference is not improper although *he knows* that his conduct will cause another to break his contract or otherwise refuse to do business with a third person." Restatement (Second) of Torts § 773 cmt. a (Am. Law Inst. 1979)(emphasis added). The Restatement includes illustrations where § 773 would be applicable. For example, the first illustration states:

> A enters into a contract to buy Blackacre from B. C honestly believes that he has a right of way over Blackacre. With knowledge of the contract, C in good faith informs A of his interest and threatens to enforce it by legal proceedings if, as and when the owner of Blackacre should deny his claim. A thereupon refuses to perform his contract with B. C's interference is not improper under the rule stated in this Section.

Restatement (Second) of Torts § 773 cmt. a (Am. Law Inst. 1979).

Continental argues that the court's instruction is not supported by any law in any jurisdiction and that it has an absolute right to refuse to do business with Jerry Janvrin. But the court's instruction is supported by law and Continental misconstrues what the instruction states. There were three different business relationships at play in this case. There was the J&J Trucking—Continental Resources relationship, the J&J Trucking—CTAP relationship, and the CTAP—Continental Resources relationship. The first part of Jury Instruction No. 6 instructs the jury that, as to the J&J Trucking—Continental relationship, Continental has a right to refuse to do business with J&J Trucking and a right to exclude J&J Trucking from its property. The second part of the instruction instructs the jury as to Continental's rights in relation to a *different business relationship*, i.e. the J&J Trucking—CTAP relationship. As to the J&J Trucking—CTAP relationship, Continental cannot improperly induce CTAP to refuse to do all business with J&J Trucking.

Jury Instruction No. 6 is supported by the law in South Dakota and other jurisdictions. Because the South Dakota Supreme Court indicated that South Dakota law is based on the Restatement, this court looked to the Restatement for guidance on the elements of tortious interference with a business relationship. The court derived Jury Instruction No. 6 directly from the wording in comment b of § 766, which states the following:

> The rule stated in this section does not apply to a mere refusal to deal. Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability. . . . *There is no general duty to do business with all who offer their services, wares or patronage; but*

> *there is a general duty not to interfere intentionally with another's reasonable business expectancies of trade with third persons, whether or not they are secured by contract, unless the interference is not improper under the circumstances.*

Restatement (Second) of Torts § 766 cmt. b (Am. Law Inst. 1979) (emphasis added). Jury Instruction No. 6 is a condensed version of comment b of § 766 and thus, is consistent with and supported by the law in South Dakota.

In *Table Steaks v. First Premier Bank, N.A.*, 650 N.W.2d 829, 837 (S.D. 2002), the South Dakota Supreme Court found that the defendants improperly interfered with the plaintiff's business relationship with its customers when one defendant unilaterally terminated its credit card processing agreement and the other defendant placed plaintiff on a list that prevented plaintiff from entering into a new agreement. The Court reasoned that there was sufficient evidence to find the defendants liable because, even though the defendants were protecting themselves from fraud liability, their conduct was improper. *Id.* Thus, the South Dakota Supreme Court's opinion is not consistent with Continental's argument that it had an absolute right to refuse to do business with Janvrin. The Court expressly found that the defendant's decision in *Table Steaks* to terminate its processing agreement—to refuse to do business—was still tortious interference because the defendant acted improperly and interfered with plaintiff's business relationship with a third party. *Id.*

Instruction No. 6 is also consistent with the law in other states. For example, Continental relies heavily on *DBI Services., Inc. v. Amerada Hess Corp.*, 907 F.2d 506, 507 (5th Cir. 1990), because the facts are very similar to

this case and Texas's tortious interference law is also based on the Restatement (Second) of Torts. In *DBI*, the Fifth Circuit upheld the district court's grant of judgment n.o.v. because the defendant properly exercised its common law right to refuse to do business with the plaintiff. *Id.* at 509. The court explained that the defendant did not extend beyond its common law right because it simply requested not to be served by the plaintiff. *Id.* It did not induce or request third parties to cease doing business with the plaintiff. *Id.* ("[T]he undisputed facts indicate that Amerada Hess refused only to allow DBI to provide water or services on Amerada Hess projects. It never demanded that contractors refrain from dealing with DBI in other matters.").

Continental also relies on *Landess v. Borden, Inc.*, 667 F.2d 628, 632 (7th Cir. 1981), in its motion. In *Landess*, the Seventh Circuit also upheld the district court's judgment as a matter of law in favor of the defendant. *Id.* The court found that the defendant induced third parties not to do business with the plaintiff but that the defendant's conduct was not improper, so the defendant was not liable for tortious interference. *Id.* ("While it is true that Borden induced the farmers to terminate their contracts with Landess, we believe that Borden's conduct was privileged."). Here, the court's instruction was consistent with the law in *DBI* and *Landess*. The decision in *DBI* stated that a business has a right to refuse to do business with a party and a right to exclude a party from its property, but clarified that a business cannot improperly induce third parties to refuse to do business with another party. And *Landess* clarified that a business can induce third parties not to do

10

business with another party, so long as it is "privileged" or "not improper." *Landess*, 667 F.2d. at 632. Thus, this court's instruction is consistent with South Dakota law, as well as the law in other states with statutes based on the Restatement (Second) of Torts § 766.

## II. There was legally sufficient evidence for a jury to find that Continental's conduct was intentional and improper.

### A. Continental's Intent.

Continental argues that Janvrin did not present "any evidence that Continental asked, demanded, or otherwise induced CTAP to stop doing business with [Janvrin]" and instead that "the evidence conclusively proved that Continental merely asked CTAP not to send [Janvrin] to Continental's well locations in Buffalo, South Dakota." Docket 94 at 12. To succeed on a claim for tortious interference of a business relationship, Janvrin had to prove that Continental's actions were intentional. *Selle v. Tozser*, 786 N.W.2d 748, 753 (S.D. 2010). An action is intentional where the actor "knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766 cmt. j (Am. Law Inst. 1979).

Janvrin presented sufficient evidence to prove Continental's intent. Anderson and McCarrell gave conflicting testimony as to the contents of their phone call regarding J&J Trucking. Anderson testified that he only requested that Janvrin not be permitted to deliver in the Buffalo District. But McCarrell testified twice that he believed Anderson asked whether CTAP would still be able to make its deliveries if it didn't allow J&J Trucking to deliver to

11

Continental's well locations and that CTAP not allow J&J Trucking to deliver to any of Continental's well locations. When defense counsel asked McCarrell how he interpreted Anderson's statement that J&J Trucking not deliver to Continental "down here anymore," McCarrell stated that he interpreted "down here" as referring to the Bowman yard—not to the Buffalo District.

Also, Till testified that Tilus, a Continental employee, told him that Carlson was boasting about putting a local trucking firm out of business. Spidahl testified that McCarrell told him to take J&J Trucking out of the line up in the Bowman yard because he received a call from "the big guy." McCarrell and Spidahl both testified that Continental was CTAP's largest customer in the Bowman yard in February 2014, and McCarrell testified that he and Anderson hunted together on his ranch. Finally, Spidahl also testified that, after he left employment at CTAP and a few months after he removed J&J Trucking from the line up, he received a phone call from Duke Ochellar of CTAP that "there would be hell to pay" if he said anything to Continental.

The court acknowledges that Continental presented evidence that disputed Janvrin's evidence. Anderson testified that he only asked CTAP not to send J&J Trucking to the oil wells in the Buffalo District, but that J&J was free to deliver elsewhere. Also, McCarrell testified on cross examination that it was his decision to remove J&J Trucking from the Bowman line up and not Continental's decision. Both parties presented a conflicting set of facts, and it is for a jury to determine the credibility of witnesses and find the facts of a case. Viewing the evidence in the light most favorable to Janvrin, a reasonable

jury could have found that Continental asked, demanded, or otherwise induced CTAP to stop doing business with Janvrin and knew that the interference of the CTAP—J&J Trucking relationship was certain or substantially certain to occur.

## B. Continental's interference was improper.

Continental argues that Janvrin failed to present sufficient evidence to support a finding that the alleged interference was improper because the evidence "conclusively proved Continental merely asked CTAP not to send [Janvrin] to Continental's well locations in Buffalo, South Dakota. . . [t]hus, the evidence established that Continental was only exercising its legal rights." Docket 94 at 14. Determining whether a party's conduct is proper is generally a question of fact. *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 408 (S.D. 2008). The Restatement (Second) of Torts § 767 lays out the following factors to consider when determining if an actor's conduct is improper:

> (a) the nature of the actor's conduct;
> (b) the actor's motive;
> (c) the interests of the other with which the actor's conduct interferes;
> (d) the interests sought to be advanced by the actor;
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
> (f) the proximity or remoteness of the actor's conduct to the interference; and
> (g) the relations between the parties.

Janvrin's theory of the case was that Continental's interference was improper because it was in retaliation for Janvrin's comments in the Harding County newspaper article and because Janvrin's family and employer had

13

previously been embroiled in litigation with Continental. To support this theory, Janvrin presented evidence at trial that Janvrin's sister and employer had been involved in extensive litigation with Continental and that Janvrin's brother-in-law had an altercation with a Continental employee. Janvrin also presented evidence that he was removed from CTAP's Bowman yard line-up one day after the February 19, 2014 article was delivered. Finally, Continental claimed that it did not want to continue to have Janvrin deliver to the Buffalo District for safety reasons, but Janvrin pointed out that Continental did not have any documentation of safety violations. Continental presented evidence to contradict Janvrin's theory, but it was for the jury to decide which witnesses were credible and which were not. Making all reasonable inferences in favor of Janvrin, the court finds that there was sufficient evidence for a reasonable jury to find that Continental's interference was improper.

## III. There was legally sufficient evidence to find that Continental's conduct was the legal cause of plaintiff's injuries.

Continental argues that Janvrin failed to prove that Continental's action was the legal cause of his injuries. Docket 94 at 18. To prove a claim for tortious interference of a business relationship, Janvrin must show that, but for Continental's actions, the harm would not have occurred. *St. Onge Livestock Co. v. Curtis*, 650 N.W.2d 537, 542 (S.D. 2002); *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 250 (S.D. 1999). Continental contends that Janvrin did not present any evidence that Continental's action was the cause of Janvrin's harm because Janvrin's removal from the line-up was not a foreseeable consequence

of Continental's request that Janvrin not be permitted to deliver to the Buffalo District. Docket 94 at 19.

First, the evidence was not conclusive as to what Anderson told McCarrell during that phone call, and that issue was left to the jury to decide. Second, McCarrell testified at trial that "but for" the phone call from Anderson he would not have called Spidahl and directed him to remove Janvrin from the line-up at Bowman. Third, there was testimony at trial that Continental was CTAP's largest customer at the Bowman yard, so it was foreseeable that Janvrin would be removed from the Bowman yard's list of independent haulers if Continental improperly induced CTAP to stop sending Janvrin to all of Continental's well locations.

Continental confuses conclusive evidence and contradictory evidence. The court acknowledges that McCarrell testified that it was his decision to remove Janvrin from the list of independent haulers at Bowman, which refuted Janvrin's evidence. Similar to the other issues discussed, both parties presented testimony to support their theory of the case and to refute the other side's theory, and it was for the jury to evaluate the credibility of the witnesses and find the facts. Thus, viewing the evidence in the light most favorable to Janvrin, there was sufficient evidence for a reasonable jury to conclude that Continental was the legal cause of Janvrin's injuries.

## IV. There was legally sufficient evidence to support an award of plaintiff's claimed damages.

Continental contends that Janvrin's testimony about his lost income was not competent evidence. Docket 94 at 20. Lay witness testimony given in the form of an opinion must be: "(a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. A witness must also have personal knowledge of the matter about which a witness testifies. Fed. R. Evid. 602. "Personal knowledge or perception acquired through review of records prepared in the ordinary course of business . . . is a sufficient foundation for lay opinion testimony. *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004 (8th Cir. 1986).

Continental argues that Janvrin's testimony as to his lost income from February 19, 2014, through April 1, 2015, does not constitute competent evidence because "it was not based on personal knowledge, was improperly based on specialized knowledge, and was inadmissible hearsay." Docket 94 at 20. Continental specifically objects to Janvrin's testimony about why he added depreciation and Section 179 expense deductions back into his annual income. *Id.* And Continental asks this court to reconsider its ruling on Continental's Second Motion in Limine (Docket 44) that Janvrin has personal knowledge of his tax returns.

Janvrin's testimony about his lost income satisfies the requirements set out in the Federal Rules of Evidence. His testimony helped the jury determine a fact in issue because it explained the accurate measure of Janvrin's earned income. Also, Janvrin testified that his CPA had prepared his tax returns in the course of regularly conducted business activities and explained that he provided his CPA with the documents underlying his tax returns. Thus, the court reasserts its ruling on Continental's Second Motion in Limine that Janvrin had personal knowledge of his tax returns that was not based on specialized knowledge. *See Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004 (8th Cir. 1986)("Personal knowledge or perception acquired through review of records prepared in the ordinary course of business . . . is a sufficient foundation for lay opinion testimony."). Continental's objection that Janvrin did not explain his reasoning well enough is a credibility determination that was properly left to the jury to determine.  Thus, the court finds that a reasonable jury could determine the amount of Janvrin's lost income after considering Janvrin's testimony.

**V.     There was sufficient evidence to conclude that Janvrin exercised reasonable diligence to mitigate his damages.**

Continental claims that Janvrin is not entitled to collect damages as a matter of law because "[Janvrin] produced no evidence at trial that would support a finding that [Janvrin] exercised reasonable diligence and effort to mitigate his damages." Docket 94 at 21. In South Dakota, a person has a duty to exercise reasonable effort to mitigate his damages. *Sun Mortg. Corp. v. W.*

*Warner Oils*, 567 N.W.2d 632, 635-37 (S.D. 1997). "Reasonable diligence has been described as acting 'with such care and diligence as a person of ordinary prudence would under the circumstances,' applying 'rules of common sense, good faith, and fair dealing.' " *Id.* at 637 (citing 22 Am. Jur. 2d Damages § 498, at 583).

At trial, Janvrin testified that he placed multiple phone calls to CTAP and offered to apologize to whomever he needed to in order to get back on CTAP's list of independent haulers. Janvrin also testified that he inquired into other trucking jobs in the region and explained why they were not feasible. It was for the jury to determine whether Janvrin acted "with such care and diligence as a person of ordinary prudence." *Id.* at 637. Viewing the evidence in the light most favorable to Janvrin, the court finds that there was sufficient evidence for a reasonable jury to conclude that Janvrin exercised reasonable diligence in mitigating his damages.

## VI. There is sufficient evidence to support an award of punitive damages.

Continental alleges that this court erroneously ruled that SDCL § 21-1-4.1 is a procedural statute, and thus, the federal rules govern whether to submit punitive damages to the jury. Docket 94 at 24. Courts within this district differ on whether SDCL § 21-1-4.1 applies in federal court. This court has adopted the district court's rationale in *Ammann v. Massey-Ferguson, Ltd.*, 933 F.Supp 840, 843 (D.S.D. 1996). *See e.g.*, *Lillibridge v. Nautilus Ins. Co.*, No. 10-4105-KES, 2013 WL 870439, *7 (D.S.D. Mar. 7, 2013)(holding that

SDCL § 21-1-4.1 is procedural so the federal rules apply). In *Ammann*, the district court found that, because SDCL § 21-1-4.1 is a procedural statute as determined by the South Dakota Supreme Court, the federal rules should apply when a federal court sits in diversity. *Ammann*, 933 F.Supp. at 843 (citing *Dahl v. Sittner*, 474 N.W.2d 897, 902 (S.D. 1991)). Thus, Janvrin did not have to meet the heightened standard in SDCL § 21-1-4.1 to present the issue of punitive damages to the jury. Instead, this court evaluates whether "there is a reasonable basis to believe there has been willful, wanton, or malicious conduct" by Continental. *Lillibridge*, 2013 WL 870439 at *7.

Continental argues that Janvrin failed to present any evidence that "Continental consciously disregarded [Janvrin's] rights" and that "[t]he evidence conclusively established that Continental merely asked CTAP not to send [Janvrin] to Continental's well locations in the Buffalo District." Docket 94 at 24-25. As previously discussed, the evidence in this case was not conclusive. McCarrell's testimony contradicted Anderson's testimony as to the phone conversation regarding J&J Trucking, various witnesses contradicted each other as to the timeline of events, and Till's testimony contradicted Tilus's testimony as to their conversation about Carlson's comments. Thus, the jury was tasked with the responsibility of determining the credibility of each witness and finding the facts.

Janvrin's theory of the case was that Continental retaliated against him because of his comment in the Harding County newspaper. To support his theory, Janvrin presented evidence that: the article was published, Gordan

Carlson of Continental forwarded the article to Peter McIntyre, McIntyre forwarded the article to Anderson, Anderson called McCarrell, Anderson and McCarrell's testimony as to their phone call was inconsistent, McCarrell called Ron Spidahl and told him to terminate Janvrin's trucking contract, Janvrin was fired by CTAP on the same day the article was published, Anderson and McCarrell were friends and business associates who had previously hunted together, Continental was CTAP's largest customer at CTAP's Buffalo yard, Gordan Carlson was overheard boasting that he put a local trucking company out of business, and Continental claimed at trial that Janvrin was terminated due to safety violations but had no physical evidence of Janvrin's alleged safety violations. Based on that evidence, the court finds that there was a reasonable basis to believe that Continental intentionally and maliciously induced CTAP to stop doing business with Janvrin. Also, the court reasserts its previous ruling during trial that the testimony presented at trial established by clear and convincing evidence that there was a reasonable basis to believe that Continental acted with willful, wanton, or malicious conduct. Thus, if Janvrin had been required to meet the heightened burden in SDCL § 21-1-4.1, he did.

**VII.    The verdict was not against the great weight of the evidence.**

Continental contends that it is entitled to a new trial because the jury's verdict was against the great weight of the evidence, and that both the actual and punitive damage awards were "unfounded and excessive." Docket 94 at 11. A court should grant a new trial under Fed. R. Civ. P. 59(a) where "the verdict is against the 'great weight' of the evidence, so that granting a new trial would

prevent a miscarriage of justice." *Jacobs Mfg. Co.*, 19 F.3d at 1266. The verdict was not against the great weight of the evidence. Both parties presented evidence to support their version of events and contradict the other side's version. Also, Janvrin properly testified as to his lost income because he had personal knowledge of his tax returns and his testimony helped the jury determine a fact in issue. Finally, Janvrin presented sufficient evidence to support presenting punitive damages to the jury. Thus, Continental is not entitled to a new trial.

## CONCLUSION

In conclusion, the court finds that Janvrin presented sufficient evidence for a reasonable jury to find in Janvrin's favor. And the court finds that the jury's verdict was not against the great weight of the evidence. Thus, Continental's Renewed Motion for a Judgment as a Matter of Law and Motion for a New Trial (Docket 93) is denied.

DATED June 30, 2017.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE